LIONEL Z. GLANCY (Bar No. 134180)
ROBERT V. PRONGAY (Bar No. 270796)
CASEY E. SADLER (Bar No. 274241)
GLANCY BINKOW & GOLDBERG LLP
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
E-mail: info@glancylaw.com
lglancy@glancylaw.com
rprongay@glancylaw.com
csadler@glancylaw.com

JOSEPH E. WHITE, III
LESTER R. HOOKER (Bar No. 241590)
SAXENA WHITE P.A.
5200 Town Center Circle
Suite 601
Boca Raton, FL 33486
Tel: (561) 394-3399
Fax: (561) 394-3382
jwhite@saxenawhite.com
lhooker@saxenawhite.com

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PLUMBERS & STEAMFITTERS LOCAL 21 PENSION FUND, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>INVENSENSE, INC., BEHROOZ ABDI and ALAN KROCK,<br><br>Defendants. | Case No:<br><br>CLASS ACTION<br><br>**COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Plumbers & Steamfitters Local 21 Pension Fund ("Local 21"), by and through its undersigned counsel, alleges the following against InvenSense, Inc. ("InvenSense" or the "Company") and certain of the Company's executive officers and/or directors upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, its counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by InvenSense, with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by InvenSense; and (c) review of other publicly available information concerning InvenSense.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of purchasers of the common stock of InvenSense between July 29, 2014 and October 28, 2014, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      InvenSense is an international semiconductor company. Specifically, the Company designs and manufactures devices which are used to track motion (gyroscopes, accelerometers, and compasses) and sense audio (microphones), most of which are a combination of a micro-electrical-mechanical system (MEMS), mixed-signal integrated circuit (IC), and proprietary software. InvenSense offers these devices for a variety of applications including cellular phones, tablet computers, video game controllers and portable navigation devices.

3.      InvenSense's process of obtaining new customers hinges on a bidding process between itself and other manufacturers. A successful bid is known as a "design win." The Company has indicated in its SEC filings that the process is competitive, the selection process is lengthy, and that sales cycles are long. Due to the nature of the application-specific uses for InvenSense devices, the Company collaborates closely with potential and existing customers.

4.      Before the start of the Class Period, InvenSense counted brands such as LG Electronics and Samsung Electronics among its customers. Despite such clientele, InvenSense

had not yet secured arguably the largest and most well-known of consumer electronics companies, that of course being Apple, Inc. ("Apple").

5.      Apple, itself a company engaged in a competitive business, takes great care not to reveal specific information regarding certain products prior to release.  Pursuant to this approach, InvenSense was not permitted to reveal that its MEMS sensor would be used in the newest generation iPhone, the iPhone 6.  Yet throughout 2014, based on statements by the Company and rumors from well-respected sources, investors and analysts became confident that InvenSense had finally secured Apple as a customer, specifically in conjunction with one of its most anticipated products, the iPhone 6.  It was ultimately revealed on September 19, 2014, that InvenSense's sensors were used in the iPhone 6.  In advance of this date, the Company and Apple had worked closely and negotiated important contract terms prior to the beginning of the Class Period.

6.      On July 29, 2014, InvenSense announced financial results for the quarter ended June 29, 2014, provided guidance upcoming quarters, and made highly positive statements about the growth of its business and near term prospects. Although Defendants may not have specifically named Apple or the iPhone 6, Defendants' statements during the Class Period made it clear that InvenSense MEMS sensors were going to be part of the newest iPhone and that near term guidance reflected this in increased sales based on such a product.  In addition to this, Defendants also assured investors that margins would be consistent with past margins.  In sum, Defendants represented that the Company was enjoying very large new sale opportunities and that margins and overall profitability would, at worst, remain the same as previous periods.

7.      Despite these assurances, problems that existed prior to the Class Period were and would continue to negatively affect margins and profitability.  While securing a customer like Apple would appear to be a positive event, the pricing terms between Apple and InvenSense were substantially below average and thus operated at great detriment to InvenSense. Additionally, manufacturing issues in development and production of the iPhone 6 were negatively affecting InvenSense.  Finally, InvenSense possessed a significant inventory surplus which was required to be written off.  Thus Defendants lacked a reasonable basis on which to

assure investors that near term margins would remain consistent with previous margins.  Rather than provide all of the facts to investors, Defendants chose to hide the negative facts by issuing positive guidance and emphasizing the opportunities in a major new customer.

8.      On October 28, 2014, InvenSense announced disappointing financial results for the quarter ended September 28, 2014, and revealed a substantial drop-off in margins due in large part to below average pricing for Apple and Samsung, operational inefficiencies with the iPhone 6, and a charge related to old inventory. The Company's announcements caused InvenSense share price to decline more than 25% in one session, damaging investors.

9.      Throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose: (1) the well below average pricing arrangement entered into by the Company and its customers, namely Samsung and Apple; (2) problems with manufacturing; (3) surplus inventory; and (4) that, as a result of the foregoing, Defendants' statements were materially false and misleading at all relevant times.

10.      As a result of Defendants' wrongful acts and omissions, and the resulting decline in the market value of the Company's shares of common stock, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

11.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

12.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

13.      Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)).  The Company maintains its principal executive offices in this Judicial District.  Additionally, many of the acts charged herein,

including the preparation and dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

14.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

15.     Plaintiff Plumbers & Steamfitters Local 21 Pension Fund, as set forth in the accompanying certification, incorporated by reference herein, purchased InvenSense common stock during the Class Period, and suffered damages as a result of the federal securities law violations alleged herein.

16.     Defendant InvenSense is a Delaware corporation with its principal executive offices located at 1745 Technology Drive Suite 200, San Jose, CA 95110.

17.     Defendant Behrooz Abdi ("Abdi") has been Chief Executive Officer and President of InvenSense since October 24, 2012.  He has been a member of InvenSense's board of directors since June 2011.

18.     Defendant Alan Krock ("Krock") was Vice President and Chief Financial Officer ("CFO") of InvenSense from May 2011 until his resignation on September 2, 2014.

19.     Defendants Krock and Abdi are collectively referred to as the "Individual Defendants."

20.     The Company and the Individual Defendants are collectively referred to herein as the "Defendants."

21.     During the Class Period, the Individual Defendants, as senior executive officers of InvenSense, were privy to confidential, proprietary and material adverse non-public information concerning InvenSense, its operations, finances, financial condition and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in

connection therewith.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

22.     The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of §20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of InvenSense's business.

23.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and, through such analysts, to the investing public.  The Individual Defendants were provided with copies of the Company's reports and publicly disseminated documents alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

24.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose securities were, and are, registered with the SEC pursuant to the Exchange Act, and are traded on the NYSE and governed by the federal securities laws, the Individual Defendants had a duty to disseminate promptly accurate and truthful information with respect to InvenSense's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, to correct any previously issued statements that had become materially misleading or untrue, so the market price of InvenSense's securities would be based on truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

25.     The Individual Defendants are liable as participants in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of InvenSense's publicly traded securities by disseminating materially false and misleading statements and/or concealing material adverse facts.

## SUBSTANTIVE ALLEGATIONS

### Background

26.     Defendant InvenSense is a designer and manufacturer of motion tracking and audio sensing devices that are used in an array of consumer electronics.   The Company is incorporated in Delaware and headquartered in San Jose, California with offices in China, Taiwan, Korea, Japan, France, Slovakia, and Wilmington, Massachusetts.

### Materially False and Misleading Statements Issued During the Class Period

27.     The Class Period begins on July 29, 2014.  On this day, InvenSense issued a press release entitled "InvenSense Announces First Quarter Fiscal Year 2015 Results."  For the first quarter of 2014 for the period ended June 29, 2014, the Company reported net revenue of $66.7 million, a net loss of $4.8 million (or $.05 per share), and gross profit in the amount of $31.17 million.  Defendant Abdi stated the following:

> ***This is an exciting and promising time for InvenSense*** . . . ***Our design win portfolio continues to grow, positioning us for strong market share increases in the coming quarters as new designs ramp into volume production***.[1] We continue to transition to a platform solution company, underscored by our announcement earlier this quarter of our intention to acquire two leading sensor algorithm and software companies. These highly strategic acquisitions allow us to scale our research and development efforts in this area and deliver higher value solutions to our customers. In total, our expanding presence in key geographic markets, additional content opportunities within the mobile device market and new applications for motion and audio sensors, such as wearables, provide healthy growth drivers through the current fiscal year and beyond.

28.     On the same day, the Company held a conference call discussing the press release and the financial results therein.   Several statements made during the call affirmed the

---

[1] All emphasis is added unless otherwise noted.

Company's positive numbers and echoed the extremely positive statements made in the press release.  Defendant Abdi stated the following in pertinent part:

> We continue to experience strength in our China business with both our Six-Axis MotionTracking Solutions and our Two-Axis Optical Image Stabilization or OIS product contributing meaningfully to the top-line.
>
> **In addition, we saw an increase contribution across all of our key geographic regions as new flagship products ramped into production such as Samsung's Galaxy S5 and LG's G3.** *Key OEMs with whom we now have gained more share*.
>
> Our Six-Axis product family including the MPU-6500 and MPU-6515 Android K optimized products from price more than 70% of the 100 shipments last quarter.
>
> \*       \*       \*
>
> **We also started ramping to volume production, our third generation Six-Axis MotionTracking SoC, iP2600 or the M2 series.** *Several existing and new customers*. This ultra-low power SoC platform combines our most advanced gyro and accelerometer sensors with our third generation digital motion processor running our industry leading motion app software.
>
> The solution has been widely designed into a number of mobile gaming and wearable products which are now in the ramp phase.
>
> \*       \*       \*
>
> In the mobile market, **we're excited to report that there are number – there are multiple smartphones that include both our Six-Axis MotionTracking solution as well as our Two-Axis OIS products. These products include the LG G3 and Amazon Fire smartphones,** *as well as a number of yet to be announced phones* preparing to launch across multiple geographies in the coming months.
>
> \*       \*       \*
>
> **Turning our attention to the fiscal second quarter, we're excited to be entering a period of significant growth.** *We are ramping into production at a number of new and existing customers* **in every region which will bring us greater diversification and scale.** While we expect volume shipments of our Six-Axis MotionTracking SoCs to contribute to the majority of this growth, we also expect to achieve greater volume shipments across the majority of our motion products including Two-Axis OIS and Three-Axis discrete gyroscopes.
>
> \*       \*       \*
>
> **We also expect our third generation Six-Axis SoC to contribute meaningfully to revenues at several top tier customers**. Our third generation ultra-low power MotionTracking SoC enables always on MotionTracking features with self-calibration and integrated SensorFusion and is being rapidly and widely adopted across the majority of mobile customers.
>
> Having strategically built the inventory ahead of anticipated demand for our second generation Six-Axis products in previous quarters, we are now able to

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

7

meet **significant new customer requirements** even while we continue to add manufacturing capacity and ramp into production, our third generation Six-Axis products.

        *        *        *

We are especially pleased to see our shipments and revenue grow in North America, growing this quarter to be a substantial portion of our total business **driven primarily by significant share gain at several existing and new customers**. While the great majority of our global growth is in the smartphone category. We also expect to ramp into volume with a greater number of top brand wearable device OEMs as the attach rates of gyro continues to increase due to demand for always on activity tracking and our advanced algorithms.

        *        *        *

Our sensor and software roadmap is more compelling than ever and our customer traction is the strongest it has ever been. Our fiscal year 2015 is off to a great start as we look forward to leveraging our additional scale and customer diversity towards improving our operating margin while investing in differentiated R&D.

      29.     During the same call, Defendant Krock made similar highly positive statements about the Company's growth prospects and financials, and alluded to "at least one" new major customer, stating the following in pertinent part:

> **We see continuing progress and strength in adoption of our products across customers and therefore significant continuing market share gains in mobile market due to our products higher performance and attractive features and size. *We see this progress at a number of major customers including some representing new sizable market share gains* at customers headquartered in both the United States and China and we believe our products strength that all these customers offers an important opportunity to continue our unit shipment and revenue growth in fiscal periods beyond the current year.**

> **Considering these factors we expect fiscal '15 Q2 revenue to be in a range of $86 million to $91 million.** To support this Q2 fiscal '15 revenue outlook we currently have backlog in place representing a majority of this total current quarter revenue target. **These Q2 fiscal year '15 outlook estimates reflect only a partial quarter estimate of the related revenue opportunities as these new product opportunities with both United States based and China based OEMs are only expected to be in production for part of our fiscal Q2.** Therefore, ***these new product opportunities can contribute significant additional amounts of revenue when in production for our entire fiscal Q3 period.***

> We expect sales at our largest customer Samsung Electronics to represent mid 20% to 30% of this target reflecting strength and applications where we have existing designs and are participating and expected new customer design launches. Additionally, we expect that LG will continue to be a 10% September quarter customer as in the June quarter potentially together with at least one China based OEM depending upon the level of total Q2 revenue achieved ***and that we***

*will have at least one new 10% customer as of the September and future quarters.*

*As mentioned some of the opportunities in the United States and China represent near-term significant market share gains* and others represent new inertial sensor, especially gyroscope, attach rate opportunities. We also expect new mobile market sensor applications, such as microphones and OIS stabilization, to contribute to future revenue growth, albeit with somewhat uncertain timing.

Product mix for the current quarter continues to favor our highest volume mobile customers, and we should generate a total gross margin in line with recent levels. We believe that on a GAAP basis, our Q2 fiscal '15 gross margin will be in a range around 48%, continuing to now modestly reflect the impact of additional cost of amortization of intangibles acquired. On a non-GAAP basis, Q2 fiscal '15 gross margin is expected to be consistent with recent past quarters that is in a range around 50%. In future quarters, lower cost of products, additional production volumes and improving product yields should contribute to a favorable impact on our gross margin. *Therefore, our target non-GAAP gross margin remains unchanged.*

\*       \*       \*

*With respect to our fiscal year 2015 business opportunity, we believe that our markets continue to offer significant opportunity for growth.* Historically, net unit sales growth has been approximately 50% or more per year, with net average selling price erosion partially offsetting the effect of unit sales growth.

Given the dynamics of the markets we serve and considering business outlook factors included in this call, we continue to believe that for our fiscal year 2015, *we are well-positioned to achieve a year-over-year revenue growth rate at or above the high end of the 25% to 35% range provided in the previous financial conference call.*

30.     During the call an analyst asked for more information about Defendants' prior mention of "progress in bringing more products to market" and new customers, to which Defendant Abdi responded in pertinent part:

**[W]e do have some design wins and they are starting to come in but at this point I am not prepared to really highlight any key design wins until the products are out there.** So, I think that again it remains an investment for us and *you will see in the next few quarters you will see more meaningful contribution from that.* That's what we expect.

31.     During the call, another exchange took place between an analyst and Defendant Krock, wherein Defendant Krock again alluded to a new major customer, which contained the following in pertinent part:

*Analyst, Ascendant Capital*:

Hey, guys thanks. This is David on for Cody. I wanted to touch on what we're hearing at Samsung and their efforts to burn some inventory here and just kind of want to get how maybe that impacted your business this quarter and how you are thinking about Samsung as we go into the third quarter?

*Alan Krock*:

I mean in the recent past they have been in a range of between 30%-35% of revenue in the most recent completed quarter they were around 30% as Behrooz says **there is a lot of different new products coming into production and some potential additional new content offset, any potential change in unit volumes that people are concerned with. So, with larger new customers that's going to be clearly 10% or greater of revenue**, the percent that any one or the other existing customers occupy will drop off some but generally levels of revenue and opportunities are similar going forward **especially considering additional potential content that may be in some of the newer products**.

32.     During the call, an exchange took place after an analyst questioned Defendant Krock about the significance and extent of customer pricing issues on upcoming product launches, which the stated the following in pertinent part:

*Mark Delaney, Goldman Sachs*:

Understood, thank you for that. Can you also discuss to what extent pricing has walked in or pretty firm for product launches in the next quarter or two, or customer still come in and ask for larger pricing discounts?

*Alan Krock*:

Well I mean there is a paradigm that set many of our customers have unique schedules for negotiation of pricing as mentioned we have now substantial exposure and if it's got a gyro function and it's a smartphone substantial share of the market so, any one customer can always be jockeying for a better price as they all do it all times but generally it's about the value of the sensor function in the market with the gyro and integrated sensor attached. **So, there is no one customer with any particular window of pricing that's relevant** some of the Asian ones are quarterly some of the others are semi-annual and others even longer than that. So it's just a very broad exposure now that we have two integrated sensors with the gyro function included in smartphones maybe half the market or something like that.

33.     The above statements generated considerable excitement among analysts.   On July 30, 2014, analysts from Ascendant Capital Markets, LLC, taking note of the implicit references to Apple, upgraded InvenSense and issued the following in pertinent part:

As expected INVN delivered a strong June quarter and provided further evidence that supports our belief of the initial participation in Apple's portfolio, likely in both the

iPhone6 and wearables. InvenSense is also showing strong wins in Amazon's Fire phone with both the gyro/accelerometer plus Optical Image Stabilization (OIS). With Samsung at 30% of revenue, Xiaomi at 10% **and Apple likely joining the 10%+ customer list in September**, and having a growing presence in China, we believe INVN now has leverage to the majority of growth drivers in the smartphone and tablet market.

34.     On August 7, 2014, InvenSense filed its Quarterly Report with the SEC on Form 10-Q for the 2015 fiscal first quarter.  The Company's form 10-Q was signed and/or certified by Defendants Krock and Abdi and reaffirmed the Company's financial results previously announced on July 29, 2014.

35.     On August 25, 2014, the Company issued a press release entitled "InvenSense Announces New Chief Financial Officer" which stated that, effective on September 2, 2014, Defendant Krock would be resigning as vice president and CFO, and was to be replaced by Mark P. Dentinger.  The announcement also stated that Krock would remain as an advisor through October 31, 2014 to assist in the transition.

36.     On September 4, 2014, the Company issued a copy of Krock's separation agreement on Form 8-K which stated that Krock was to be paid $175,000 in severance and $25,000 in consulting fees during his time as an advisor.

37.     On September 9, 2014, Apple announced the release of the iPhone 6 and 6 Plus, which contain an InvenSense MEMS sensor.

38.     On September 18, 2014, InvenSense announced on a Form 8-K that the Company held its annual meeting of stockholders on that day and that Defendant Abdi and Eric Stang were elected as directors to serve until 2017.

39.     The statements contained in ¶¶21-32 were materially false and/or misleading when made because defendants misrepresented or failed to disclose the following: (1) that the Company had agreed to supply its MEMS sensors to Apple at significantly lower prices as compared to others; (2) that such low prices charged to Apple, Samsung, and other customers did and would continue to have a negative effect on InvenSense's business; (3) that InvenSense had encountered significant manufacturing issues which also resulted in a negative effect on the Company; (4) that Defendants statements on near term guidance and assurance to investors that margins being consistent with historical levels lacked any reasonable basis; (5) that the

Company's form 10-Q failed to disclose then presently known trends, events or uncertainties associated with the Company's sales and margins that were reasonably likely to have a material effect on InvenSense's future operating results; and (6) that, as a result of the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company's financial performance and outlook during the Class Period.

40. On October 28, 2014, the Company issued a press release entitled "InvenSense Announces Second Quarter Fiscal Year 2015 Results" which reported GAAP gross margins of 35% and non-GAAP gross margins of 37%, much lower than the previous GAAP gross margins of 47% and non-GAAP gross margins of 50%. The press release stated the following in pertinent part:

> Gross margin determined in accordance with U.S. generally accepted accounting principles (GAAP) for the second quarter of fiscal 2015 was 35 percent, compared with 47 percent for the first quarter of fiscal 2015. GAAP gross margin for second quarter fiscal 2015 included stock-based compensation and related payroll taxes, and amortization of acquisition intangibles.
>
> ***Excluding these items, non-GAAP gross margin for the second quarter fiscal 2015 was 37 percent, compared with 50 percent for the first quarter of fiscal 2015. The sequential decrease in gross margin was primarily attributable to two factors: a non-recurring inventory charge largely related to earlier generations of the company's products that reduced the gross margin by approximately eight percentage points, and a shift in revenue mix towards lower margin, high volume customers that reduced the gross margin by approximately five percentage points.***
>
> GAAP net loss for the second quarter of fiscal 2015 was $6.9 million, or 8 cents per share. By comparison, GAAP net loss was $4.8 million, or 5 cents per share for the first quarter fiscal 2015. GAAP net loss for second quarter fiscal 2015 included stock-based compensation and related payroll taxes, accretion interest expense on convertible notes, amortization of acquisition intangibles, a write-off of in-process research and development costs in connection with the company's acquisition of the microphone business line of Analog Devices, Inc. in fiscal 2014, business acquisition costs, litigation expenses, which were partially offset by a gain on the company's equity investment in Trusted Positioning, Inc., and income tax effect of non-GAAP adjustments.
>
> Excluding the items described above, non-GAAP net income for the second quarter of fiscal 2015 was $4.9 million or 5 cents per diluted share, compared with $7.0 million or 8 cents per diluted share for the first quarter of fiscal 2015.

41.     Later that day, the Company hosted a conference call discussing the financial results.    During the call, CFO Mark Dentinger discussed the Company's disappointing performance, stating the following in pertinent part:

> Most of our Q2 performance was within our expectations with the Company issued guidance early in Q2, except for gross margins. The lower than expected gross margins had the effect of reducing our non-GAAP EPS by about $0.11.
>
> *       *       *
>
> There were three primary factors contributing to the lower gross margin performance this quarter.
>
> First, **we recorded approximately $7.4 million in adjustments in Q2, mostly to write down earlier generation inventory that is now excess or obsolete. These inventory write-downs resulted in 8-point margin reduction** from our Q1 actuals. We do not expect most of these adjustments to repeat in Q3.
>
> Second, **while unit volumes exceeded our expectations, a greater than anticipated contribution of this quarter's revenue came from our largest customers, and these customers generate lower average selling prices**. We also sold some of our older product at prices that diluted our margins in Q2. The combinations – the combination of these pricing issues resulted in a 3 percentage point quarter over quarter decline in gross margin.
>
> We expect that the customer mix issue will continue for the rest of the fiscal year and we have factored this expectation into our Q3 guidance.
>
> **Finally, our yielded manufacturing costs, especially for our newer products, were higher than we expected and this lowered our gross margin by 2 percentage points in Q2**. We also expect this phenomenon to continue into Q3.
>
> *       *       *
>
> Looking towards Q3, we are estimating that total revenue will be within a range of $108 million to $115 million, with a customer and market mix approximately what we experienced in Q2. As a result, our expectations for non-GAAP gross margins in fiscal Q3 is a range between 46% and 47%. Our Q3 non-GAAP gross margin guidance presumes that most of the inventory adjustments we recorded in Q2 will not be repeated. The margin guidance does presume some of the pricing pressure resulting from our mix of business towards larger customers and most of our cost pressure will continue.
>
> Non-GAAP operating expenses are expected to rise by about $2 million from Q2 with R&D expenses forecasted at about $19 million and SG&A expenses at $10 million. The Q3 increase in operating expenses takes into consideration a full quarter of expenses for TPI and Movea. Our non-GAAP net other expense and our tax rate should be about flat with Q2.
>
> Non-GAAP EPS should be a range between $0.17 and $0.21 per share, assuming an average share count of about 95 million. If you are modeling us on a GAAP basis, our gross margin should be between 43% and 44%. Our operating margin

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
13

should be between 8% and 12%, and our GAAP EPS should be between $0.06 and $0.10 in Q3.

42.     During the call, Defendant Abdi and Dentinger had an exchange with an analyst about the Company's disappointing margins, which stated the following in pertinent part:

*Ruben Roy, Piper Jaffray*

Can you maybe walk us through some more details on some of the moving parts around the gross margin? You gave us guidance back in late July and I'm wondering what some of the changes were during the quarter, around ASPs and yields, that you hadn't seen when we got the original guidance.

*Mark Dentinger, InvenSense, Inc. CFO*

We were a little surprised by the strength of the contribution from our large customers, which, on general, bring lower gross margins. And, as a result of that, we felt a little bit of that pressure.

Second, we did move some older material at reduced margins during the quarter that we don't expect to repeat going forward. And we are still digesting some of the cost pressure from ramping up the production with the new customers. So the combination of those three factors really had us about 5 points lower than what we were calling as we entered the quarter. And, as I indicated in my guidance, we do expect some of that pressure to continue as we move into Q3. But we are forecasting that there will be an improvement off of what would be the, quote-unquote, adjusted 45 points of gross margin as we move into Q3. And we are looking at 46% to 47% margins for this quarter.

*Behrooz Abdi, InvenSense President and CEO*

This is Behrooz. Let me add a little bit more color. As we talked at the last earnings call, what we said was that, to the extent that our tier 1 customer mix changes and they become more dominant, that it will be more difficult to hit the gross margin early on, until we get to full production yielded and kind of a steady-state run rate. And, if you look at our business mix, the top two customers are more dominant this past quarter and the current quarter than we anticipated when we started. The rest of the market -- the rest of the customers and product lines are either at or well above the corporate goal in terms of gross margin. So it is really the mix, as Mark mentioned, is more than anticipated towards the tier ones.

43.     During the call, there was an exchange between Defendant Abdi and an analyst about pricing arrangements with customers, which stated the following in pertinent part:

*Ruben Roy, Piper Jaffray*

Thanks for that. I wondering, on sort of the pricing negotiations, I mean, are there pricing dynamics over the course of three or six months? Or are they -- how does that work? I'm trying to figure out if there are additional ASP-related margin impacts that we might expect over the next couple of quarters. And then, I guess,

as a follow-up, the near-term improvement that Mark discussed for the December quarter, is that all yield based?

*Behrooz Abdi, InvenSense President and CEO*

Yes. Some of them are yield based; some of them are just, again, based on the pricing given to some of the customers to get the revenue and the market and to really get that going. But, in terms of the pricing, it really depends on the customer. There are customers that, even tier ones, that when we set the price roadmap, pretty much done for the year, for the next year. So, what we anticipate in terms of going forward, it is already baked in. And then there are customers, as you know, that negotiate on a quarterly basis and that is what we have been used to in the past. And, again, we make some assumption around those in our prediction of pricing and gross margins.

44. On the call, Dentinger responded to another question about margins from a different analyst, as shown below:

*Joe Moore, Morgan Stanley*

I wanted to follow up on the customer concentration issue, that you said customers --if I heard this right -- greater than 10% of revenues had only moved up from 52% last quarter to 55% this quarter. I was a little bit surprised by that, given that you had brought up a new customer, and also that you guys were surprised it, by the shift when it doesn't seem like it was that big. Was it just the two OEMs that were the problem or was there some other issue?

*Mark Dentinger, InvenSense, Inc.* CFO

Let me answer them in reverse order, Joe. It was just the two OEMs -- the large OEMs that created most of the pricing pressure. The other phenomenon -- it is a little bit more subtle.

It is true that our contribution from 10% customers moved from 52% to 55% during the quarter, but there were more than two customers contributing to the 52% in Q2 -- or excuse me, in Q1. So we only had two customers contributing in Q2, so there was a pretty substantial move inside the 10% customers upstream to the lower margin arena.

45. In response to the statements made on October 28, 2014, the price of InvenSense common shares declined from $21.48 per share to a closing price of $16.08 per share, a drop of 25%, on unusually high trading volume.

46. Analysts covering InvenSense noted Company's poor financial Results and reacted negatively. For example, an October 29, 2014 research report characterized the Company as having a "[d]isappointing quarter," and stated that '[i]t's going to take time for confidence to be restored." The report went on to state the following in pertinent part:

Our take: Disappointing quarter. We had forecast higher revenues and lower GMs vs. company guidance, and they fell short of our estimate on both counts as average selling prices, principally to Apple which we estimate was 31% of sales in the qtr, were lower . . . What happened: Non gaap eps of $0.06 on $90mn revs (vs. MSe $0.20 / $96mn and consensus $0.16 / $90mn). Gross margins were 34.7% vs. 50% guidance and our estimate of 48%; excluding an 8 point impact from inventory writedown, GMs would have been 42.7%, still quite disappointing. We believe Apple ASPs were even lower than we had forecast, and INVN initial manufacturing yields weren't great. Apple and Samsung combined were 55% of revenues. Opex was slightly higher after taking into consideration one off expenses for TPI and Movea. We model GAAP operating margins at 11.5% in 3q15. December qtr guidance was for revs $108-115 (we were $121, consensus $116), gross margins 46-47% (we were 48%), and higher opex and share count than we had modelled. Why gross margins were worse. The company cited higher volumes from the top 2 customers, Apple and Samsung, who are 55% of revenues, but we believe those customers were in line with our model; overall revenues were only slightly higher than forecast. Our sense is that the company's plan to achieve margin improvement while ramping Apple required near perfect yields, but that proved too optimistic as meeting quality requirements with a new product required bringing yields down. We were not confident in prospects for margin improvement while ramping Apple, but are still surprised by the magnitude of the shortfall; it's somewhat healthy that GM targets are more achievable. Having said that, we are discouraged that opex and share count continue to rise faster than the company's forecast, with R&D up 166% in 5 qtrs (partly due to M&A).

47.    On October 29, 2014, Barron's published an article entitled "InvenSense Plunges 24%: Crushed by Lower Prices in Apple, Samsung Wares," which stated the following in pertinent part:

Shares of sensor maker InvenSense (INVN) are down $5.22, or 24%, at $16.26, after the company yesterday afternoon reported fiscal Q2 revenue and earnings per share that missed analysts' expectations, and forecast results this quarter lower as well.

Revenue in the three months ended in September rose 27% to $90.2 million, missing consensus of $90.7 million, and EPS of 5 cents was well below consensus for 16 cents.

The company forecast revenue of $108 million to $115 million this quarter, and EPS of 17 cents to 21 cents, missing the Street's average estimate for $117 million and 31 cents.

Gross margin declined from 50% a year earlier to 37%, on a non-GAAP basis.
CEO Behrooz Abdi said it was an "exciting time" for the company, noting record revenue, and cited a "full portfolio of differentiated products that we believe will provide meaningful growth opportunity for years to come."

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

16

CFO Mark Dentinger on the conference call said InvenSense was selling into products with lower average selling prices, crimping InvenSense's own prices and margins.

> *While unit volumes exceeded our expectations, a greater than anticipated contribution of this quarter's revenue came from our largest customers, and these customers generate lower average selling prices. We also sold some of our older product at prices that diluted our margins in Q2. The combinations – the combination of these pricing issues resulted in a 3 percentage point quarter over quarter decline in gross margin. We expect that the customer mix issue will continue for the rest of the fiscal year and we have factored this expectation into our Q3 guidance.*

The stock has gotten three downgrades this morning, that I can see, from Piper Jaffray, Pacific Crest, and Northland.

Pac Crest's John Vinh, cutting his rating, to Sector Perform from Outperform, writes that "more things went wrong than right."

InvenSense didn't "execute" well, he thinks, but also its dominant market share in products from Apple (AAPL), and Samsung Electronics (005930KS) actually hurt, not helped.

He thinks the company probably saw pressure on pricing from some Apple products:

> *Despite having secured a dominant position at Apple and Samsung, indeed, 100% share, InvenSense executed poorly in what was anticipated to be one of the strongest quarters in the company's history. Instead, price pressures from Apple and Samsung and the acknowledgment of potential second-sourcing significantly reduce our confidence that InvenSense will be able to sustain growth and avoid multiple compression [ . . . ] Pricing pressure associated with Apple business is having a substantial impact on InvenSense's margin expectations. The company indicated that it expects pricing pressures will continue for the next several quarters, which lowers its gross margin outlook to the high 40%s from 50%-55%. As FQ3 (Dec.) is expected to have similar product and customer mix, InvenSense guided gross margin for the quarter to be 46%-47%. The company remains confident that its new product launches in F2016 will help improve the margin profile. However, we anticipate that lower gross margin will contract valuation multiples.*

## CLASS ACTION ALLEGATIONS

48.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all those who purchased InvenSense's securities between July 29, 2014 and October 28, 2014, inclusive (the "Class Period") and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate

families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

49.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, InvenSense's securities were actively traded on the NYSE (an open and efficient market) under the symbol "INVN."  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  As of October 24, 2014, the Company had over 90 million shares outstanding. Millions of InvenSense shares were traded publicly during the Class Period on the NYSE. Record owners and other members of the Class may be identified from records maintained by InvenSense or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

50.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

51.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

52.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether Defendants participated in and pursued the common course of conduct complained of herein;

(c)     whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period misrepresented material facts about the business, finances, financial condition and prospects of InvenSense;

(d)      whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of InvenSense;

(e)      whether the market price of InvenSense common stock during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

(f)      to what extent the members of the Class have sustained damages and the proper measure of damages.

53.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

54.      The market for InvenSense's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, InvenSense's securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired InvenSense's securities relying upon the integrity of the market price of the Company's securities and market information relating to InvenSense, and have been damaged thereby.

55.      During the Class Period, Defendants materially misled the investing public, thereby inflating the price of InvenSense's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  Said statements and omissions were materially false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about InvenSense's business, operations, and prospects as alleged herein.

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

56.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about InvenSense's financial well-being and prospects.

57.     These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION

58.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of InvenSense's securities and operated as a fraud or deceit on Class Period purchasers of InvenSense's securities by failing to disclose to investors that the Company's financial results were materially misleading and misrepresented material information.  When Defendants' misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the prices of InvenSense's securities fell precipitously as the prior inflation came out of the Company's stock price.  As a result of their purchases of InvenSense's securities during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.* damages, under the federal securities law.

59.     By failing to disclose the true state of the Company's business prospects and operations, investors were not aware of the true state of the Company's financial status. Therefore, Defendants presented a misleading picture of InvenSense's business and prospects. Thus, instead of truthfully disclosing during the Class Period the true state of the Company's business, Defendants caused InvenSense to conceal the truth.

60.     Defendants' false and misleading statements caused InvenSense's common stock to trade at artificially inflated levels throughout the Class Period.  However, as a direct result of the Company's problems coming to light, InvenSense's common stock price fell precipitously from its Class Period high.  The stock price drop discussed herein caused real economic loss to investors who purchased the Company's securities during the Class Period.

61.     The decline in the price of InvenSense's common stock after the truth came to light was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of InvenSense's common stock price decline negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct.  The economic loss suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of InvenSense's securities and the subsequent decline in the value of InvenSense's securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## SCIENTER ALLEGATIONS

62.     As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding InvenSense, his/her control over, and/or receipt and/or modification of InvenSense's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning InvenSense, participated in the fraudulent scheme alleged herein.

63.     Defendants were further motivated to engage in this fraudulent course of conduct in order to allow Company insiders to sell shares of their personally-held InvenSense common stock at inflated prices, yielding them proceeds of more than $5.3 million during the Class Period.  Defendant Krock personally reaped more than $3 million from sales of Company shares during the Class Period.  Further, Defendant Abdi was motivated to hide the true nature of the Company from investors to ensure that he would be re-elected to InvenSense's Board of Directors at the September 18, 2014 meeting of shareholders.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

64.     At all relevant times, the market for InvenSense's securities was an efficient market for the following reasons, among others:

(a)     InvenSense stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     as a regulated issuer InvenSense filed periodic public reports with the SEC and/or the NYSE;

(c)     InvenSense regularly communicated with public investors *via* established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)     InvenSense was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

65.     As a result of the foregoing, the market for InvenSense's securities promptly digested current information regarding InvenSense from all publicly available sources and reflected such information in InvenSense's stock price. Under these circumstances, all purchasers of InvenSense's securities during the Class Period suffered similar injury through

1   their purchase of InvenSense's securities at artificially inflated prices and a presumption of

2   reliance applies.

3                              **NO SAFE HARBOR**

4          66.    The federal statutory safe harbor provided for forward-looking statements under

5   certain circumstances does not apply to any of the allegedly false statements pleaded in this

6   Complaint. The statements alleged to be false and misleading herein all relate to then-existing

7   facts and conditions. In addition, to the extent certain of the statements alleged to be false may be

8   characterized as forward looking, they were not identified as "forward-looking statements" when

9   made and there were no meaningful cautionary statements identifying important factors that

10  could cause actual results to differ materially from those in the purportedly forward-looking

11  statements.

12         67.    In the alternative, to the extent that the statutory safe harbor is determined to

13  apply to any forward-looking statements pleaded herein, Defendants are liable for those false

14  forward-looking statements because at the time each of those forward-looking statements was

15  made, the speaker had actual knowledge that the forward-looking statement was materially false

16  or misleading, and/or the forward-looking statement was authorized or approved by an executive

17  officer of InvenSense who knew that the statement was false when made.

18        **COUNTS AGAINST DEFENDANTS UNDER THE EXCHANGE ACT**

19                              **COUNT I**
20  **Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder**
                              **Against All Defendants**

21         68.    Plaintiff repeats and realleges the allegations set forth above as though fully set

22  forth herein.  This claim is asserted against all Defendants.

23         69.    During the Class Period, InvenSense and the Individual Defendants, and each of

24  them, carried out a plan, scheme and course of conduct which was intended to and, throughout

25  the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class

26  members, as alleged herein; (ii) artificially inflate and maintain the market price of InvenSense

27  common stock; and (iii) cause Plaintiff and other members of the Class to purchase InvenSense

28

stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

70.    These Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for InvenSense securities in violation of §10(b) of the Exchange Act and Rule 10b-5.  Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.  The Individual Defendants are also sued herein as controlling persons of InvenSense, as alleged herein.

71.    In addition to the duties of full disclosure imposed on Defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S X (17 C.F.R. § 210.01 et seq.) and S-K (17 C.F.R. § 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete and accurate information.

72.    InvenSense and the Individual Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future prospects of InvenSense as specified herein.  These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of

InvenSense's value and performance and substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about InvenSense and its business, operations and future prospects, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of InvenSense's securities during the Class Period.

73.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) each of the Individual Defendants was a high-level executive and/or director at the Company during the Class Period; (ii) each of the Individual Defendants, by virtue of his responsibilities and activities as a senior executive officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's operational and financial projections and/or reports; (iii) the Individual Defendants enjoyed significant personal contact and familiarity with each other and were advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

74.     These Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing InvenSense's operating condition, business practices and future business prospects from the investing public and supporting the artificially inflated price of its stock.   As demonstrated by their overstatements and

misstatements of the Company's financial condition and performance throughout the Class Period, the Individual Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were severely reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

75.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of InvenSense securities was artificially inflated during the Class Period.  In ignorance of the fact that the market price of InvenSense's shares was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by these Defendants during the Class Period, Plaintiff and the other members of the Class acquired InvenSense securities during the Class Period at artificially inflated high prices and were damaged thereby.

76.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known of the true performance, business practices, future prospects and intrinsic value of InvenSense, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired InvenSense securities during the Class Period, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

77.     By virtue of the foregoing, InvenSense and the Individual Defendants each violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

78.     As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## COUNT II
## Violation of Section 20(a) of the Exchange Act Against Defendants Abdhi and Krock

79.     Plaintiff repeats and realleges the allegations set forth above as if set forth fully herein.  This claim is asserted against all the Individual Defendants.

80.     The Individual Defendants were and acted as controlling persons of InvenSense within the meaning of §20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's actual performance, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

81.     In addition, each of the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

82.     As set forth above, InvenSense and the Individual Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their controlling positions, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.  As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff

and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for relief and judgment, as follows:

a)    Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b)    Awarding Plaintiff and the other members of the Class damages in an amount which may be proven at trial, together with interest thereon;

c)    Awarding Plaintiff and the members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

d)    Awarding such other relief as this Court deems appropriate.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.


DATED: January 14, 2015        By: *s/ Lionel Z. Glancy*
        **GLANCY BINKOW & GOLDBERG LLP**
        Lionel Z. Glancy
        Robert V. Prongay
        Casey E. Sadler
        1925 Century Park East, Suite 2100
        Los Angeles, California 90067
        Telephone: (310) 201-9150
        Facsimile: (310) 201-9160
        Email: info@glancylaw.com
        lglancy@glancylaw.com
        rprongay@glancylaw.com
        csadler@glancylaw.com

        *Liaison Counsel for Plaintiff*

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

**SAXENA WHITE P.A.**
Joseph E. White, III
Lester R. Hooker
5200 Town Center Circle
Suite 601
Boca Raton, FL 33486
Tel: 561 394-3399
Fax: 561 394-3382

*Lead Counsel for Plaintiff*

## CERTIFICATION

I, Rick Iaccarino, on behalf of the Plumbers & Steamfitters Local 21 Pension Fund ("Local 21"), hereby certify, as to the claims asserted under the federal securities laws, that:

1.   I am authorized in my capacity as General Counsel to initiate litigation and to execute this Certification on behalf of Local 21.

2.   Local 21 did not purchase the securities that are the subject of this action at the direction of counsel, or in order to participate in any action arising under the federal securities laws.

3.   Local 21 is willing to serve as a representative party on behalf of the Class, including by providing testimony at deposition and trial, if necessary.

4.   Local 21's transactions in InvenSense, Inc. common stock are set forth in the Schedule A attached hereto.

5.   Local 21 has sought to serve and was appointed as lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification:
     *None*

6.   Local 21 has sought to serve as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification, but either withdrew its motion for lead plaintiff, was not appointed lead plaintiff or the lead plaintiff decision is still pending:
     *None*

7.   Local 21 will not accept any payment for serving as a representative party on behalf of the Class beyond Local 21's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.
Executed this _15_ day of January, 2015.

Plumbers & Steamfitters Local 21 Pension Fund

Rick Iaccarino, General Counsel